In re:                                              CASE NO. 07-bk-00575-ABB

F.F. STATION, LLC.,                                 CHAPTER 11
a Florida limited liability company,

                    Debtor.
_____/

F.F. STATION, LLC,                                  Adv. Pro. No. 08-___
a Florida limited liability company,

                    Plaintiff,

vs.

FIRST NATIONAL BANK AND TRUST CO.
OF WILLISTON,

                    Defendant.
_____/

## COMPLAINT

Plaintiff, F.F. Station, LLC ("FF Station" or "Plaintiff"), as the above-captioned Debtor, hereby

sues Defendant, First National Bank and Trust Co. of Williston ("First National" or "Defendant"), a national

banking association, with its banking house located in Williston, North Dakota, and alleges, upon

information and belief, as follows:

### Nature of the Action

1.      This is an adversary proceeding brought pursuant to Sections 544, 548 and 550 of Title

11 of the United States Code (the "Bankruptcy Code"), Chapter 726, Florida Statutes, and Rule 7001

of the Federal Rules of Bankruptcy Procedure, seeking to avoid actual and constructively fraudulent conveyances.

## Jurisdiction and Venue

2.     This Court has jurisdiction over the subject matter of this complaint pursuant to 28 U.S.C. §§ 1334 and 157.

3.     Venue is proper in this district under 28 U.S.C. § 1409.

4.     This adversary proceeding is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(H).

## The Parties

5.     Plaintiff, FF Station is a Florida limited liability company with its principal place of business at 2100 Lee Road, Suite F, Winter Park, Florida 32789.

6.     Defendant, First National is a national banking association chartered under the laws of the United States of America with its principal place of business at 22 East Fourth Street, Williston, North Dakota 59801.

7.     Louis J. Pearlman Enterprises, Inc. ("LJPE Inc.") is a Florida corporation with its principal place of business in Orlando, Florida. On April 18, 2007, LJPE Inc. filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Middle District of Florida, Orlando Division, case no. 6:07-bk-01505-ABB (the "LJPE Inc. Bankruptcy Proceeding").

8.     Trans Continental Studios, Inc. ("TCS") is a Florida corporation with its principal place of business in Orlando, Florida.

9.      Louis J. Pearlman ("Pearlman") is an individual and a resident of the State of Florida. Pearlman was the managing member and registered agent of FF Station and the director and registered agent of LJPE Inc.

10.     Trans Continental Airlines, Inc. ("TCA") is a Florida corporation with its principal place of business in Orlando, Florida.

11.     Trans Continental Records, Inc. ("TCR") is a Florida corporation with its principal place of business in Orlando, Florida.

12.     Rocks Timepieces, Inc. ("Rocks") is a Florida corporation with its principal place of business in Orlando, Florida.

13.     Rocks Fine Jewelry, Inc. ("RFJ") is a Delaware corporation with its principal place of business in Orlando, Florida.

## History and Structure of FF Station

14.     On or about March 23, 2001, Robert I. Kling ("Kling") formed FF Station as a limited liability company pursuant to the Florida Limited Liability Company Act.  Kling, either in his individual capacity or through L.L. Church Street, LLC ("LLCS"), was the managing member of FF Station until October 11, 2005.

15.     FF Station owned the real property located at 76-129 West Church Street and 124 West Pine Street in Orlando, Florida, which consisted of several buildings and businesses (collectively, "Church Street Station"). The Church Street Station complex was originally constructed around Orlando's original train station.  The designers paid a lot of attention to detail and historical accuracy. The Train Depot was

listed in the National Registry of Historic Places and contained numerous historical artifacts. The most impressive artifact was "Old Duke", a steam locomotive that was in the movie <u>Wings of Eagles</u> with John Wayne.

16.     The restored train station along with the old-fashioned bar Rosie O''Grady's Good Time Emporium swelled in popularity until eventually a whole 10 block area of restored buildings was created with numerous restaurants, nightclubs, banquet facilities and comedy clubs. Church Street Station also offered live entertainment, fine dining and the Church Street Exchange Shopping Emporium - a three story complex that had over 50 shops, restaurants and midway games.

17.     On or about July 1, 2002, Kling, LLCS, and TCS executed a Third Amended and Restated Operating Agreement (the "Third Operating Agreement"). Pursuant to the Third Operating Agreement: (i) TCS obtained a fifty percent (50%) membership interest in FF Station; (ii) Kling's membership interest in FF Station was reduced to thirty percent (30%); and (iii) LLCS's membership interest in FF Station was reduced to twenty percent (20%).

18.     On or about June 29, 2005, LJPE Inc. purchased Kling's membership interest in FF Station. In addition, LLCS transferred its' remaining two percent (2%) membership interest to Kling. Thereafter, Kling resigned as manager of FF Station and on October 14, 2005, Pearlman, as president of LJPE Inc., became the sole managing member of FF Station.

19.     By December 6, 2006, LJPE Inc. had obtained ninety-eight percent (98%) of the membership interest in FF Station, while Kling maintained his two percent (2%) membership interest in FF Station. On or about December 6, 2006, Kling and LJPE Inc. executed an Amendment to the Third

Operating Agreement ("December Amendment"), which created two (2) classes of membership interests in FF Station, Class "A" Membership Interest and Class "B" Membership Interest.

20. Pursuant to the December Amendment: (i) Kling's two percent (2%) membership interest in FF Station, became a two percent (2%) Class B Membership Interest in FF Station; and (ii) LJPE Inc.'s ninety-eight percent (98%) membership interest in FF Station, became a one hundred percent (100%) Class A Membership Interest in FF Station and a ninety-eight percent (98%) Class B Membership in FF Station.

21. On or about February 19, 2007, LJPE Inc. executed another amendment to the Third Operating Agreement ("February Amendment"), which named Michael Moecker as the sole managing member of FF Station. LJPE Inc. and Pearlman ceased all continuing involvement with FF Station.

22. On February 20, 2007 ("Petition Date"), FF Station filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code; no trustee has been appointed. FF Station continues to operate its business and manage its property as a debtor-in-possession under §§ 1101(a) and 1108 of the Code.

## Pearlman and The E.I.S.A. Investment Scheme

23. From January 2003 until December 2006, TCA collected approximately $118 million from investors through a TCA program called Employee Savings Investment Account ("E.I.S.A."). The State of Florida, Office of Financial Regulation ("OFR") conducted an investigation of TCA's E.I.S.A. program. As a result of the investigation, the OFR determined that a significant amount, if not all, of the E.I.S.A. funds are gone.

24.    According to the OFR, TCA, Trans Continental Airlines Travel Service Inc. ("TCA Travel"), Trans Continental Enterprises, LLC ("TCE"), Pearlman, Robert Fischetti ("Fischetti") and Michael Crudele ("Crudele") (collectively, the "Trans Con Entities") violated the registration and anti-fraud provisions of Chapter 517, Florida Statutes, and the prohibitions against soliciting or receiving funds for deposit without being authorized to do business in the State of Florida as a financial institution as set forth in Chapter 655, Florida Statutes, by offering and selling unregistered securities identified as the E.I.S.A. program.

25.    The E.I.S.A. program investors were not required to be employees of TCA, and with few exceptions the E.I.S.A. investors were in fact not employees or family members of the employees of TCA.

26.    Investors in the E.I.S.A. program were advised by the E.I.S.A. offering documents as well as by sales agents, who worked at the direction of Pearlman and Crudele, that in exchange for an investor depositing funds in the E.I.S.A. program, an investor would earn "high yield Money Market" interest rates.

27.    The Trans Con Entities engaged in securities fraud by making a variety of misrepresentations that caused individual E.I.S.A. investors to believe that their investments were safe, secure and deposited with U.S. financial institutions, and allegedly guaranteed by the FDIC and other insurance. However, the existence of FDIC or other insurance was a fabrication in addition to the false representations that all E.I.S.A. funds were maintained in U.S. institutions.

28.    The E.I.S.A. funds were deposited into various checking accounts in the name of TCA. Under the E.I.S.A. program, these funds were supposed to be transferred to FDIC insured financial

institutions where the funds would generate higher than average dividends. Investors were led to believe that TCA would continue to provide account information on "Trans Continental" account statements reflecting "available balance," "insured amount," and "interest rate." Such account statements were in fact provided to investors.

29.    However, rather than invest the E.I.S.A. funds, the Trans Con Entities used the approximately $118 million to pay earlier investors both dividends and cash withdrawals, to pay commissions to sales agents who marketed the program, and to funnel money to insiders and related business entities, including LJPE Inc. According to the OFR investigation, LJPE Inc. received $34,000,000.00 from the E.I.S.A. funds.

30.    On February 2, 2007, the OFR filed an amended verified complaint for temporary and permanent injunction and appointment of receiver against the Trans Con Entities and twelve other relief defendants, including FF Station (the "OFR Litigation"). The OFR Litigation is based upon the OFR's investigation of a "ponzi" scheme allegedly operated by Pearlman and certain companies owned by him with respect to the sale of unregistered securities or investments, also known as the E.I.S.A. program.

31.    However, the OFR did not allege and does not assert that FF Station engaged in the sale of unregistered securities or other such investments. On February 2, 2007, Gerald A. McHale, Jr. was appointed as receiver over certain Pearlman entities. On February 23, 2007, a hearing was scheduled on a motion to appoint Mr. McHale as a receiver for all of the relief defendants ("Receiver Hearing"). However, the Receiver Hearing was stayed as to FF Station by virtue of the bankruptcy filing. Although, at the Receiver Hearing, the State of Florida, on behalf of the OFR, made it clear that the State of Florida

did not assert and could not demonstrate that the relief defendants, including FF Station, had engaged in such conduct.

32.     On June 27, 2007, Pearlman was indicted for violations of 18 U.S.C. §§ 1344, 1341, and 1343, and charged with three counts of bank fraud, one count of mail fraud, and one count of wire fraud. On March 3, 2008, the United States filed a First Superseding Information which charged Pearlman with scheming to commit mail fraud, wire fraud, money laundering, and securities fraud in violation of 18 U.S.C. §§ 371, 1957, and 152(4).

33.     On March 4, 2008, Pearlman entered into a Plea Agreement with respect to the First Superseding Information and agreed to plead guilty to: (i) two counts of conspiring to commit an offense against the United States in violation of 18 U.S.C. §371; (ii) one count of money laundering in violation of 18 U.S.C. §1957; and (iii) one count of presenting or using a false claim in a bankruptcy proceeding in violation of 18 U.S.C. §152(4).

34.     In the Plea Agreement, Pearlman admits to: (i) using TCA and TCA Travel in the operation of a "ponzi" scheme based upon the fraudulent investments known as the E.I.S.A. program and the sale stock in TCA Travel; (ii) engaging in a bank fraud scheme involving misrepresentations about Pearlman and several of his companies financial condition; and (iii) participating in a bankruptcy fraud scheme.

### The Fraudulent Transfers

35.     On or about June 29, 2005, First National and Pearlman entered into a loan agreement in the original principal amount of $18,500,000.00 for the purpose of: (i) capitalizing Rocks; and (ii)

refinancing certain existing indebtedness of Pearlman to First National (the "Pearlman Loan"). A copy of the Pearlman Loan is attached hereto as **Exhibit "A"** and is incorporated herein by reference.

36.     Pursuant to the Pearlman Loan, Pearlman executed a promissory note in the principal amount of $18,500,000.00 ("Pearlman Note"). A copy of the Pearlman Note is attached hereto as **Exhibit "B"** and is incorporated herein by reference.

37.     In addition to the Pearlman Note, Pearlman pledged 269,700 shares of common stock in TCA as collateral for the Pearlman Loan ("Stock Pledge"). A copy of the Stock Pledge is attached hereto as **Exhibit "C"** and is incorporated herein by reference.

38.     As additional collateral for the Pearlman Loan, TCA, TCR, Rocks, and RFJ each provided an absolute and unconditional guaranty for the full and prompt repayment of the Pearlman Loan. TCA also entered into a Repurchase Agreement with First National, whereby upon the occurrence of an event of default under the Pearlman Loan and subsequent demand by First National, TCA agreed it would purchase all of the shares of TCA stock pledged by Pearlman.

39.     Upon information and belief, First National disbursed $18,500,000.00 to Pearlman pursuant to the Pearlman Loan. Since that initial disbursement, some of the payments due under the Pearlman Loan were made; however, the payments were not always timely.

40.     LJPE Inc. and FF Station did not provide: (i) any collateral securing the Pearlman Loan; (ii) guaranty the repayment of the Pearlman Loan; or (iii) receive any proceeds of the Pearlman Loan.

41.     On or about May 25, 2006, FF Station and Copper Star Bank ("Copper Star") executed a Loan Agreement, Mortgage, Assignment of Leases and Rents, Fixture Financing Statement, Security

Agreement, and Promissory Note, under which Copper Star loaned FF Station $4,700,000.00 in exchange for a second mortgage on Church Street Station ("Second Mortgage").

42.     On or about May 31, 2006, LJPE Inc., as the sole managing member of FF Station, caused Copper Star to transfer by wire $2,970,000.00 (the "Second Mortgage Funds") to a bank account with Bank of America, N.A. in the name of LJPE Inc.

43.     On or about June 1, 2006, the Second Mortgage Funds were then transferred to another bank account within Bank of America, N.A., also in the name of LJPE Inc.

44.     The Second Mortgage Funds were transferred to LJPE Inc. with the actual intent to hinder, delay or defraud present and future creditors of FF Station.

45.     FF Station received no fair consideration from LJPE Inc. in exchange for the Second Mortgage Funds.

46.     FF Station was insolvent on the date of the transfer of the Second Mortgage Funds, and remained insolvent continuously thereafter.

47.     At the time of the transfer of the Second Mortgage Funds, FF Station was engaged in a business or transaction for which the remaining property of FF Station constituted an unreasonably small amount of capital in relation to the business or transaction.

48.     At the time of the transfer of the Second Mortgage Funds, FF Station intended to incur, believed or reasonably should have believed that it would incur, debts that would be beyond FF Station's ability to pay as they became due.

49.     LJPE Inc. did not provide value to FF Station in exchange for the Second Mortgage Funds, nor did it take the Second Mortgage Funds in good faith.

50.     But for the LJPE Inc. Bankruptcy Proceeding, FF Station could have avoided the transfer of the Second Mortgage Funds under 11 U.S.C. §§ 544 and 548, and Fla. Stat. §§ 726.105(1)(b), 726.106(1), and 726.108(1)(a).

51.     On June 6, 2006, $2,455,377.16 of the Second Mortgage Funds were transferred from LJPE Inc. to First National by check number 3250. A copy of the check is attached hereto as **Exhibit "D"** and is incorporated herein by reference.

52.     Upon information and belief, the $2,455,377.16 was transferred to First National as a bi-annual installment payment under the Pearlman Loan ("Pearlman Loan Payment").

53.     First National did not provide value to either FF Station or LJPE Inc. in exchange for the Pearlman Loan Payment, nor did it take the Pearlman Loan Payment in good faith and without knowledge of the voidability of the transfer.

## COUNT I.
### FRAUDULENT TRANSFER RECEIVED BY FIRST NATIONAL UNDER 11 U.S.C. §§548 AND 550(A)(2)

54.     Paragraphs 1 through 53 inclusive are realleged and incorporated herein by reference.

55.     This is an adversary proceeding to recover fraudulent transfers pursuant to 11 U.S.C. §§548 and 550(a)(2) from First National as the immediate or mediate transferee of LJPE Inc.

56.     Within two years prior to the Petition Date, FF Station transferred, to or for the benefit of LJPE Inc., the Second Mortgage Funds.

57.     Within two years prior to the Petition Date, LJPE Inc., the initial transferee, transferred the Pearlman Loan Payment to or for the benefit of First National.

58.     To the extent that the Second Mortgage Funds are avoidable, First National as an immediate or mediate transferee of the avoided transfer is liable to the bankruptcy estate of FF Station for the value of the Pearlman Loan Payment.

59.     The Second Mortgage Funds and the subsequent Pearlman Loan Payment were transfers of property of FF Station.

60.     FF Station was insolvent at the time of the transfer or became insolvent as a result thereof.

61.     FF Station was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital.

62.     FF Station intended to incur, or believed that it would incur, debts that would be beyond its' ability to pay as such debts matured.

63.     FF Station received less than reasonable equivalent value in exchange for such transfer.

64.     The Pearlman Loan Payment, as proceeds of the Second Mortgage Funds, was transferred with the actual intent to hinder, delay or defraud any entity to which FF Station was or became, on or after the date that such payments were made, indebted.

65.     First National did not take the Pearlman Loan Payment for value and in good faith, or without knowledge of the voidability of the transfer.

66.     Pursuant to 11 U.S.C. § 550(a), the recovery of property for the benefit of FF Station's estate is authorized to the extent that the transfer is avoided under 11 U.S.C. § 548.

**WHEREFORE,** FF Station, LLC, requests that this Court enter a judgment against First National; (i) avoiding the Pearlman Loan Payment pursuant to 11 U.S.C. §548; (ii) recovering the value of the Pearlman Loan Payment from First National pursuant to 11 U.S.C. §550; (iii) granting pre-judgment interest from the date of the Pearlman Loan Payment; (iv) granting all costs from this action; and (v) for such other and further relief as the Court deems just and proper.

## COUNT II.
### FRAUDULENT TRANSFER RECEIVED BY DEFENDANT FIRST NATIONAL UNDER 11 U.S.C. §§544(b) AND 550(A)(2), AND FLA. STAT. §§726.105(1)(a) AND (b), 726.106(1), AND 726.108

67.     Paragraphs 1 through 66 inclusive are realleged and incorporated herein by reference.

68.     This is an adversary proceeding to recover fraudulent transfers pursuant to 11 U.S.C. §§544(b) and 550(a)(2), and Fla. Stat. §726.101 *et seq.* from First National as the immediate or mediate transferee of LJPE Inc.

69.     Within four years prior to the Petition Date, LJPE Inc., as the initial transferee, transferred the Pearlman Loan Payment to or for the benefit of First National.

70.     To the extent that the Second Mortgage Funds are avoidable, First National as an immediate or mediate transferee of the avoided transfer is liable to the bankruptcy estate of FF Station for the value of the Pearlman Loan Payment.

71.     The Second Mortgage Funds and the subsequent Pearlman Loan Payment were transfers of property of FF Station.

72.     FF Station was insolvent at the time of the transfer or became insolvent as a result thereof.

73. FF Station was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital.

74. FF Station intended to incur, or believed that it would incur, debts that would be beyond its' ability to pay as such debts matured.

75. FF Station received less than reasonable equivalent value in exchange for such transfer.

76. The Pearlman Loan Payment, as proceeds of the Second Mortgage Funds, was transferred with the actual intent to hinder, delay or defraud any entity to which FF Station was or became, on or after the date that such payments were made, indebted.

77. First National did not take the Pearlman Loan Payment for value and in good faith, or without knowledge of the voidability of the transfer.

78. There is at least one actual holder of an allowed unsecured claim pursuant to 11 U.S.C. §502, who would have standing to assert a claim for relief under the Florida Uniform Fraudulent Transfer Act ("FUFTA").

79. The Pearlman Loan Payment is avoidable under Fla. Stat. §726.108(1)(a) and 11 U.S.C. §544(b).

80. Pursuant to 11 U.S.C. §550(a), the recovery of property for the benefit of FF Station's estate is authorized to the extent the Pearlman Loan Payment is avoided under 11 U.S.C. §544(b) and FUFTA.

**WHEREFORE,** FF Station LLC, requests that this Court enter a judgment against First National: (i) avoiding the Pearlman Loan Payment pursuant to 11 U.S.C. §544(b) and Fla. Stat. §§726.105(1)(b),

726.106(1), and 726.108; (ii) recovering the value of the Pearlman Loan Payment from First National pursuant to 11 U.S.C. §550; (iii) granting pre-judgment interest from the date of the Pearlman Loan Payment; (iv) granting all costs from this action; and (v) for such other and further relief as the Court deems just and proper.

**RESPECTFULLY SUBMITTED**, this 24<u>th</u> day of June, 2008.

> /s/ R. Scott Shuker
> R. Scott Shuker, Esquire
> Florida Bar No.984469
> rshuker@lseblaw.com
> Mariane L. Dorris, Esquire
> Florida Bar No. 0173665
> mdorris@lseblaw.com
> **LATHAM, SHUKER, EDEN & BEAUDINE, LLP**
> 390 N. Orange Avenue, Suite 600
> P.O. Box 3353
> Orlando, Florida 32802-3353
> Tel: 407-481-5800
> Fax: 407-481-5801
> Attorneys for FF Station LLC

# LOAN AGREEMENT

THIS LOAN AGREEMENT is made as of June 29, 2005 by and between LOUIS J. PEARLMAN, a Florida resident (the "Borrower") and FIRST NATIONAL BANK & TRUST CO. OF WILLISTON, a national banking association (the "Lender").

## RECITALS

A.     Borrower has requested that Lender make available to Borrower a loan in the principal amount of Eighteen Million Five Hundred Thousand and 00/100 Dollars ($18,500,000.00) (the "Loan") evidenced by a promissory note of Borrower in favor of Lender dated of even date herewith in the original principal amount of $18,500,000.00 (the "Note"); and

B.     Lender is providing the Loan to Borrower for the purposes of (i) capitalizing ROCKS TIMEPIECES, INC., a Florida corporation ("Timepieces") and (ii) refinancing certain existing indebtedness of the Borrower to the Lender; and

C.     Pursuant to a certain Securities Pledge Agreement of even date herewith by and between the Borrower and the Lender (the "Pledge Agreement"), the Loan is secured by, among other things, a first priority pledge of and security interest in 269,700 shares of common stock of Trans Continental Airlines, Inc., a Florida corporation ("TCA") owned by the Borrower and more particularly described in the Pledge Agreement (the "Pledged Shares").

D.     Pursuant to a certain Third Party Security Agreement of even date herewith by and between Trans Continental Merchandising, Inc., a Florida corporation ("Merchandising") and the Lender (the "Merchandising Security Agreement"), the Loan is further secured by a first priority security interest in all accounts receivable owned by Merchandising relating to sales of Merchandising's "Making the Hit" product, consisting of computer software, microphone and related materials (the "MTH Accounts").

E.     Pursuant to a certain Third Party Security Agreement of even date herewith by and between ROCKS TIMEPIECES, INC., a Florida corporation ("Timepieces") and the Lender (the "Timepieces Security Agreement"), the Loan is further secured by a first priority security interest in all furniture, fixtures, equipment, inventory and accounts receivable owned by Timepieces, and all proceeds thereof (the "Timepieces Collateral").

F.     Pursuant to a certain Third Party Copyright Security Agreement of even date herewith between Trans Continental Publishing, Inc., a Florida corporation ("Publishing") and the Lender (the "Copyright Security Agreement"), the Loan is further secured by a first priority security interest in the "Gulf Coast Record Catalogue" (the "Catalogue") and all copyrights and royalties relating thereto owned by Publishing and more particularly described in the Copyright Security Agreement.

G.     Pursuant to separate Guaranty by Corporation of even date herewith executed by TCA, Trans Continental Records, Inc., a Florida corporation ("Records"), Timepieces and ROCKS FINE JEWELRY, INC., a Delaware corporation ("Jewelry"), each of TCA, Records, Timepieces and Jewelry has guarantied the obligations of the Borrower in respect of the Loan.

**EXHIBIT "A"**

H.    Pursuant to a Loan Participation and Servicing Agreement of even date herewith among Lender and various loan participants in the Loan (the "Participants"), the Participants have appointed Lender as servicer for the performance of certain duties called for in this Agreement; and

I.    Lender is willing to make advances under the Loan to Borrower upon the terms and subject to the conditions set forth herein.

NOW, THEREFORE, in consideration of the foregoing and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1.    Definitions.

a.    "Closing Date" means the date hereof.

b.    "Collateral" means, collectively, the Pledged Shares, the MTH Accounts, the copyrights and royalty rights of Publishing in and to the Catalogue (the "Catalogue Rights"), the Timepieces Collateral and any and all other property, or rights or interests therein, as more fully described in the Merchandising Security Agreement,, the Timepieces Security Agreement, the Copyright Security Agreement and/or the Pledge Agreement.

c.    "GAAP" means generally accepted accounting principles as in effect from time to time, which shall include the official interpretations thereof by the Financial Accounting Standards Board, consistently applied.

d.    "Guaranties" means, collectively, (i) that certain Guaranty by Corporation of even date herewith executed by Records in favor of the Lender (the "Records Guaranty"), (ii) that certain Guaranty by Corporation of even date herewith executed by TCA in favor of the Lender (the "TCA Guaranty"), (iii) that certain Guaranty by Corporation of even date herewith executed by Timepieces in favor of the Lender (the "Timepieces Guaranty"), and (iv) that certain Guaranty by Corporation of even date herewith executed by Jewelry in favor of the Lender (the "Jewelry Guaranty").

e.    "Loan Documents" means this Agreement, the Note, the Pledge Agreement, the Guaranties, the Merchandising Security Agreement, the Timepieces Security Agreement, the Copyright Security Agreement, the Repurchase Agreement, the UCC Financing Statements, and all other documents, instruments or agreements necessary to give effect to this Agreement and the transactions contemplated hereby.

f.    "Repurchase Agreement" means that certain Repurchase Agreement of even date herewith between TCA and the Lender (and acknowledged by the Borrower) relating to TCA's agreement to purchase the Pledged Shares from the Borrower upon the terms and conditions set forth therein.

2.    The Credit Facility. Subject to and upon the terms and conditions hereof, and in reliance upon the representations and warranties of the Borrower herein, Lender will make the Loan to or at the direction of the Borrower in a single advance in the aggregate principal amount

of $18,500,000.00 for the purposes described herein and any other purposes otherwise approved by the Lender. The Loan is not a revolving credit facility and Borrower may not borrow, repay and re-borrow amounts advanced. The Loan shall bear interest at the rate of interest set forth in the Note, shall be payable over the term set forth in the Note and shall be prepayable as set forth in the Note. All amounts paid in respect of the Note shall be applied in accordance with the terms of the Note. All payments and prepayments of the principal of and interest on the Loan shall be made by Borrower to the Lender pursuant to the terms of the Note and the other Loan Documents.

3. <u>Disbursement of Loan Proceeds; Conditions</u>. The Loan is evidenced by and payable pursuant to the Note, and is secured by the Collateral. The Lender's obligation to make the Loan is conditioned upon the Lender's receipt of each of the following, in form and substance satisfactory to the Lender:

   i. The Loan Documents, each executed by Borrower, TCA, Records, Merchandising, Publishing, Timepieces and Jewelry, as applicable, in favor of Lender;

   ii. Resolutions of the Board of Directors (together with sufficient documentation of such Board's appointment and authority) of Records, Merchandising, Publishing, Timepieces and Jewelry authorizing the execution, delivery and performance of the Loan Documents to which it is a party, and related documents and the transactions contemplated thereby;

   iii. Resolutions of all of the shareholders of TCA authorizing the execution, delivery and performance of the Loan Documents to which it is a party (including without limitation the Repurchase Agreement) and related documents and the transactions contemplated thereby;

   iv. Articles of Incorporation of TCA, Records, Publishing, Merchandising, Timepieces and Jewelry, certified as correct and complete within 30 days prior to the date hereof by the Florida or Delaware Secretary of State, as applicable, a copy of the Bylaws of TCA, Records, Publishing, Merchandising, Timepieces and Jewelry and an unqualified certificate of good standing for each of TCA, Records, Publishing, Merchandising and Timepieces, issued by the Florida Secretary of State, and for Jewelry issued by the Delaware Secretary of State;

   v. UCC searches with respect to Borrower, Publishing, Merchandising and Timepieces;

   vi. Certificates of insurance and insurance endorsements required hereby;

   vii. UCC Financing Statements, each naming the Lender as secured party, with respect to the Pledged Shares, the MTH Accounts, the Catalogue Rights, the Timepieces Collateral and all other Collateral for the Loan; and

   viii. Such additional documents, reports, certificates and agreements as the Lender reasonably determines are necessary or appropriate.

4.    <u>Representations and Warranties of Borrower</u>.  In order to induce Lender to advance the proceeds of the Loan, pursuant to the terms hereof, Borrower hereby represents and warrants to Lender as follows:

a.    Each of TCA, Records, Publishing, Merchandising and Timepieces is a corporation, duly organized and validly existing under the laws of the State of Florida.  Jewelry is a corporation, duly organized and validly existing under the laws of the State of Delaware.  Each of TCA, Records, Publishing, Merchandising, Timepieces and Jewelry is duly qualified to do business and is in good standing in every jurisdiction wherein the nature of its business or the character of its properties makes such qualification necessary and where failure to be so qualified and in good standing, in the aggregate, would have a material adverse effect on the business, properties, operations, assets, liabilities or condition (financial or otherwise) of such entity.  Each of TCA, Records, Publishing, Merchandising, Timepieces and Jewelry has all requisite power and authority to carry on its business as now conducted and as presently proposed to be conducted.

b.    Each of Borrower, TCA, Records, Publishing, Merchandising, Timepieces and Jewelry has full power and authority to execute and deliver the Loan Documents to which he or it is a party and to incur and perform his or its obligations hereunder and thereunder.  The execution, delivery and performance by Borrower, TCA, Records, Publishing, Merchandising, Timepieces and Jewelry of the Loan Documents to which he or it is a party and any and all other documents and transactions contemplated hereby or thereby, will not violate any provision of law or result in the breach of, constitute a default under, or create or give rise to any lien under, any indenture or other agreement or instrument to which Borrower, TCA, Records, Publishing, Merchandising, Timepieces or Jewelry is a party or by which Borrower, TCA, Records, Publishing, Merchandising, Timepieces, Jewelry, or his or its property may be bound or affected.  The Loan Documents have been executed and delivered to the Lender by Borrower and by an appropriate officer of each of TCA, Records, Publishing, Merchandising, Timepieces and Jewelry who has full legal capacity to execute and so deliver such agreements.

c.    The Loan Documents constitute the legal, valid and binding obligations of Borrower, TCA, Records, Publishing, Merchandising, Timepieces and Jewelry, enforceable in accordance with their respective terms.

d.    There is no action, suit or proceeding pending or, to the knowledge of Borrower, threatened against or affecting Borrower, TCA, Records, Publishing, Merchandising, Timepieces or Jewelry, nor any basis therefor, which, if adversely determined, would have a material adverse effect on the condition (financial or otherwise), business, properties or assets of Borrower, TCA, Records, Publishing, Merchandising, Timepieces or Jewelry, or which would question the validity of the Loan Documents, or any instrument, document or other agreement related hereto or required hereby, or impair the ability of Borrower, TCA, Records, Publishing, Merchandising, Timepieces or Jewelry, to perform its respective obligations under the foregoing agreements.

e.    Each of TCA, Records, Publishing, Merchandising, Timepieces and Jewelry (collectively, the "Trans Continental Companies") possesses adequate licenses, permits, franchises, patents, copyrights, trademarks and trade names, or rights thereto (collectively

- 4 -

"Licenses"), to conduct its business substantially as now conducted and as presently proposed to be conducted. Each License is validly issued and in full force and effect. Each of the Trans Continental Companies has fulfilled and performed all of its obligations with respect thereto. No event has occurred which: (1) results in, or after notice or lapse of time or both would result in, suspension, surrender, failure to renew, revocation or termination of any material License; or (2) materially and adversely affects or in the future may materially adversely affect any of the rights of the Trans Continental Companies thereunder. None of the Trans Continental Companies is a party to and Borrower does not have any knowledge of any notice of violation, order or complaint issued by or before any court or regulatory body or of any other proceedings which could in any manner result in suspension, surrender, failure to renew, revocation or termination of any material License or otherwise threaten or adversely affect the validity or continued effectiveness of any License. Borrower has no reason to believe that any Licenses will not be renewed in the ordinary course. Each of the Trans Continental Companies has fully cooperated with every regulatory body having jurisdiction over any of the Licenses or the activities of the Trans Continental Companies, as the case may be, with respect thereto, and each of the Trans Continental Companies has filed all material reports, applications, documents, instruments, and information required to be filed by it pursuant to applicable laws, rules and regulations. Each of the Trans Continental Companies has posted all required bonds required under its Licenses.

f.     Borrower, Publishing, Merchandising and Timepieces own the Collateral subject to no prior security interests, assignments, liens or encumbrances at the time of closing. Lender has a valid first perfected security interest in the Collateral subject to no prior security interests, liens or encumbrances. The security interest of Lender has been or shall be filed and/or recorded with the appropriate recording offices. There are no limitations or restrictions on the Borrower's, Publishing's, Merchandising's or Timepiece's right or ability to pledge or grant a lien or security interest upon the Collateral in favor of the Lender.

g.     Except with respect to the approval of TCA's shareholders as to the Repurchase Agreement, no consent, approval, order or authorization of, or registration, declaration or filing with, or notice to, any governmental authority or any third party is required in connection with the execution and delivery of the Loan Documents, or any of the agreements or instruments contemplated thereby to which Borrower is a party, or in connection with the carrying out or performance of any of the transactions required or contemplated hereby or thereby or, if required, such consent, approval, order or authorization has been obtained or such registration, declaration or filing has been accomplished or such notice has been given prior to the date hereof.

h.     Borrower has filed all local, state, federal and other tax returns required to be filed by him and either paid all taxes shown thereon to be due, including interest and penalties, which are not being contested in good faith and by appropriate proceedings, or provided adequate reserves for payment thereof. Borrower has no information or knowledge of any objections to or claims for additional taxes in respect of local, state and federal or other income or excess profits tax returns of Borrower for prior years.

i.     Borrower does not intend to, or believe that he will, incur debts beyond his ability to pay such debts as they mature.

j.     All financial and other information provided to Lender by or on behalf of Borrower and the Trans Continental Companies in connection with Borrower's request for the Loan fairly presents the financial condition of Borrower and such Trans Continental Companies as of the dates thereof and discloses fully all liabilities of Borrower and such Trans Continental Companies. Since the date of such financial and other information, there has been no material adverse change in the financial condition of Borrower or such Trans Continental Companies.

k.     Borrower is not engaged in the business of extending credit for the purpose of purchasing or carrying margin stock (within the meaning of Regulation U issued by the Board of Governors of the Federal Reserve System), and no proceeds of the Loan will be used to purchase or carry any margin stock or to extend credit to others for the purpose of purchasing or carrying any margin stock.

l.     No proceeds of the Loan will be used to acquire any security in any transaction which is subject to Sections 13 and 14 of the Securities Exchange Act of 1934.

m.     The transactions evidenced by this Agreement do not violate any law pertaining to usury or the payment of interest on Loan.

n.     Borrower will use the proceeds of the Loan solely for lawful and proper purposes of Borrower, as described herein.

5.     Affirmative Covenants. Borrower covenants and agrees as follows:

a.     Borrower will use the proceeds of each Loan solely for the purposes described herein, and related purposes approved by the Lender, and to pay the transactional costs associated with the Loan.

b.     Borrower will pay all of his taxes, levies, assessments and governmental charges prior to the time when any penalties or interest accrue, unless contested in good faith with an adequate reserve for payment.

c.     Each of the Trans Continental Companies will continue the conduct of its business, maintain its company existence, maintain all rights, licenses and franchises necessary or desirable in the normal conduct of its business, comply with all rules, regulations and orders of any governmental or other authority or agency and all applicable federal and state laws and regulations. Without in any way limiting the generality of the foregoing, each of the Trans Continental Companies will maintain all licenses required under all applicable state and federal aviation laws and regulations for the operation of their respective businesses, and will timely file all reports as any applicable commission or authority may from time to time require or request.

d.     Borrower will deliver to Lender:

i.     Within one hundred twenty (120) days after the end of each fiscal year of TCA, Records, Timepieces and Jewelry, (A) the consolidated internally-prepared balance sheet and income statement of Records, Timepieces and Jewelry for such fiscal year, (B) the consolidated audited financial statements of TCA, in each case certified (without qualification as to the opinion or scope of examination) by a firm of independent certified public accountants

selected by Records, TCA, Timepieces or Jewelry, as the case may be, and acceptable to Lender, and (C) personal financial statement, personal cash flow statement and state and federal tax returns of the Borrower.

ii.     Within forty-five (45) days after the end of each fiscal quarter, consolidated, internally prepared, quarterly balance sheet and income statement of TCA.

iii.     Upon the request of Lender, all relevant information relating to the Collateral.

iv.     Promptly upon becoming aware thereof, notice of any default with respect to any indebtedness of the Borrower, whether owed to Lender or any other creditor.

e.     Upon reasonable notice of not less than 24 hours, Borrower will permit any officer, employee, attorney or accountant for Lender or any Participant to review, make extracts from, or copy any and all corporate and financial books and records of Borrower and/or the Trans Continental Companies at all times during ordinary business hours, to send and discuss with the Trans Continental Companies requests for verification of amounts owed to Borrower, and to discuss the affairs of the Trans Continental Companies with any of its officers or managers. After the occurrence of an Event of Default, no prior notice to Borrower shall be required in connection with the Lender's exercise of its rights hereunder.

f.     Borrower will provide Lender with an insurance certificate, issued by the insurer or insurers, of the Borrower and the applicable Trans Continental Companies, in form and content and from insurers acceptable to Lender, providing in each case for ten (10) days' written notice to Lender of cancellation or non-renewal (without qualification), and evidencing the following categories and amounts of coverage:

i.     Comprehensive public liability coverage for Borrower and the Trans Continental Companies.

ii.     Comprehensive physical damage insurance for the full insurable value of the Collateral, naming Lender as loss payee, as its interests may appear.

iii.     Such other insurance as Lender may reasonably require, naming Lender as additional insured or loss payee.

g.     Borrower will notify Lender promptly of (i) any material disputes or claims against the Borrower or any one or more of the Trans Continental Companies in respect of the Collateral; (ii) any damage, destruction or theft of any Collateral; (iii) any change in the persons constituting the officers or directors of any one or more of the Trans Continental Companies; (iv) the occurrence of any breach, default or event of default by or attributable to Borrower under this Agreement or any of the Loan Documents; and (v) any event which may have any effect on the enforceability or priority of any lien in favor of Lender, or on the ability of Borrower to perform his obligations under the Loan Documents.

h.     Borrower will notify Lender in writing promptly after the commencement of any lawsuit, legal proceeding or proceedings before any governmental or regulatory agency

against Borrower or any one or more of the Trans Continental Companies, which may have a material adverse effect on the Loan, the Collateral, Lender or any Participant or the business of Borrower or any of the Trans Continental Companies. As used herein, material adverse effect means a lawsuit or proceeding involving a potential cost or loss of $50,000.00 or more.

        i.      Borrower will keep full and complete books of record and accounts for itself and other records reflecting the results of Borrower's operations, all in accordance with GAAP.

        6.    <u>Negative Covenants</u>. Borrower covenants and agrees that, except with the prior written approval of Lender:

        a.      Borrower will not create, incur or cause to exist any pledge, security interest, encumbrance, lien or other charge of any kind upon the Collateral, whether now owned or hereafter acquired, except for the security interests created by the Loan Documents. Except as permitted by the Pledge Agreement, the Security Agreement or the Copyright Security Agreement, neither Borrower nor any of the Trans Continental Companies, as the case may be, will sell, dispose of, lease, mortgage, assign, sublet or transfer all or any part of Borrower's or such Trans Continental Company's right, title or interest in or to all or any portion of the Collateral.

        b.      Borrower will not permit any of the Trans Continental Companies to substantially alter the general nature of the business in which it is engaged, or engage in any line of business materially different in relation to the transactions contemplated by this Loan Agreement from its current business.

        c.      Borrower will not permit any material breach, default or event of default to occur under any note, loan agreement, indenture, lease, mortgage, contract for deed, security agreement or other contractual obligation binding upon Borrower which is not cured within the applicable cure provisions thereof.

        d.      None of the Trans Continental Companies will change its state of organization, or merge with and into any other entity.

        e.      Neither Borrower nor TCA will cause, permit or consent to any change in the ownership of the shares of capital stock of TCA.

        7.    <u>Event of Default</u>. Each of the following occurrences shall constitute an Event of Default under this Agreement and under the Loan Documents (herein called an "Event of Default"):

        a.      Borrower shall fail to pay any or all of the indebtedness arising out of this Agreement or the other Loan Documents (the "Obligations") when due, and such failure shall continue for a period of five (5) days after such payment becomes due; or

        b.      Borrower shall fail to observe or perform any covenant or agreement binding on Borrower under this Agreement or under any other assignment, conveyance, instrument or agreement now in effect or hereafter made between Borrower and Lender, or under

any of the other Loan Documents, and such failure shall continue for a period of thirty (30) days after notice thereof from Lender to Borrower; or

c.  Borrower or any of the Trans Continental Companies shall make any representations or warranties in this Agreement or in any other Loan Document or assignment, conveyance, instrument, agreement, financial statement, report or certificate heretofore or at any time hereafter submitted by or on behalf of Borrower or any of the Trans Continental Companies to Lender, and such representations or warranties, shall prove to have been false or materially misleading when made; or

d.  As a result of a default or failure by Borrower, payment of any substantial indebtedness of Borrower shall be demanded, or the maturity of any substantial indebtedness shall be accelerated, or any precondition or circumstance permitting any creditor of Borrower (acting individually or with the consent of other creditors) to accelerate the maturity of any substantial indebtedness shall have occurred; for this purpose indebtedness shall be deemed substantial if it exceeds $100,000.00; or

e.  Borrower or any of the Trans Continental Companies shall become insolvent or shall commit an act of bankruptcy under the United States Bankruptcy Act, or shall file or have filed against it or him, voluntarily or involuntarily, a petition in bankruptcy or for reorganization or for the adoption of an arrangement or plan under the United States Bankruptcy Act or shall procure or suffer the appointment of a receiver for any substantial portion of its or his properties, or shall initiate or have initiated against it or him, voluntarily or involuntarily, any act, process or proceeding under any insolvency law or other statute or law providing for the modification or adjustment of the rights of creditors and if any such petition, receiver, act, process or proceeding is involuntary, the same shall not be dismissed or discharged within ninety (90) days; or

f.  A garnishment summons or writ of attachment for an amount in excess of $100,000.00 shall have been issued against or served upon Lender or any Participant for the attachment of any property of Borrower in Lender's or such Participant's possession or any indebtedness owing Borrower; or

g.  Any of the Trans Continental Companies shall have been dissolved, whether voluntarily or by operation of law, or shall cease to conduce business; or

h.  Any of Licenses material to this Agreement are revoked or rescinded, lapse, or otherwise are no longer maintained by or available to Borrower of any of the Trans Continental Companies, as applicable; or

i.  The net worth of the Borrower shall at any time be less than $25,000,000 (net of any and all contingent liabilities); or

j.  TCA shall fail to maintain its "Tangible Net Worth" (as defined herein) at less than $50,000,000 at any time during the term hereof ("Tangible Net Worth" shall mean the difference between (i) the tangible assets of TCA, after deducting proper and adequate reserves, and (ii) all indebtedness of TCA, all as determined in accordance with generally accepted accounting principals; provided, however, that in no event shall there be included as tangible

- 9 -

assets patents, trademarks, trade names, copyrights, licenses, goodwill, receivables from affiliates, directors, officers or employees of TCA, deferred charges or any securities or indebtedness of TCA or any other securities unless the same are readily marketable in the United States of America or entitled to be used as a credit against federal income tax liabilities); or

k.    TCA's "Debt Service Coverage Ratio" (as defined herein) shall at any time be less than 2.0 to 1.0 ("Debt Service Coverage Ratio" shall mean the ratio of (1) earnings of TCA before interest, taxes, depreciation and amortization, to (2) the sum of (i) current maturities of long term debt plus (ii) interest expense, all as determined in accordance with generally accepted accounting principals).

8.    <u>Rights and Remedies Upon Default</u>. Upon the occurrence of an Event of Default and at any time thereafter, the Lender may exercise any one or more of the following rights and remedies:

a.    Lender may declare all unmatured Obligations to be immediately due and payable, and the same shall thereupon be immediately due and payable, without presentment or other notice or demand;

b.    Lender may exercise and enforce any and all rights and remedies available upon default to a secured party under the Uniform Commercial Code including, without limitation, the right to take possession of the Collateral, or any evidence thereof, proceeding without judicial process or by judicial process (without a prior hearing or notice thereof, which Borrower hereby expressly waives) and the right to sell, lease or otherwise dispose of any or all of the Collateral, and Borrower agrees to make the Collateral available to Lender at a place to be designated by Lender which is reasonably convenient to Lender. If notice to Borrower of any intended disposition of the Collateral or any other intended action is required by law in a particular instance, such notice shall be deemed commercially reasonable if given at least ten (10) calendar days prior to the date of intended disposition or other action;

c.    Lender may request Borrower to, and upon such request Borrower will, assist Lender in repossessing and selling the Collateral in compliance with all applicable laws (this provision in no way limits Lender's right to use any other or additional person or entity to repossess and sell the Aircraft);

d.    Without notice or demand, Lender may offset any indebtedness which Lender or any Participant, or any of Lender's or such Participant's successors or assigns then owe to Borrower, whether or not then due, against any Obligation then owed to Lender or any of its successors or assigns by Borrower, whether or not then due;

e.    Lender may exercise its rights against TCA pursuant to the Repurchase Agreement; and

f.    Lender may exercise or enforce any and all other rights or remedies available by law or agreement against the Collateral, against Borrower or against any other person or property, including without limitation its rights under the Guaranties and all other Loan Documents.

9.     Miscellaneous. Borrower agrees that:

a.     The performance or observance of any promise or condition set forth in this Agreement may be waived in writing by Lender, but not otherwise. No delay in the exercise of any power, right or remedy of Lender, shall operate as a waiver thereof, nor shall any single or partial exercise thereof or the exercise of any other power, right or remedy operate as a waiver thereof.

b.     This Agreement shall be binding upon Borrower and his heirs, successors and assigns and shall inure to the benefit of Lender, each Participant and their respective successors and assigns, provided that Borrower shall not transfer or assign his rights hereunder without the prior written consent of Lender. This Agreement shall be effective as of the date hereof. All rights and powers specifically conferred upon Lender may be transferred or delegated by Lender to any of its Participants and to Lender's and Participant's successors or assigns. Except to the extent otherwise required by law, this Agreement and the transactions evidenced hereby shall be governed by the substantive laws of the State of Minnesota without regard to principles of conflicts of laws. If any provision or application of this Agreement is held unlawful or unenforceable in any respect, such illegality or unenforceability shall not affect other provisions or applications which can be given effect, and this Agreement shall be construed as if the unlawful or unenforceable provision or application had never been contained herein or prescribed hereby. All representations and warranties contained in this Agreement or in any other agreement between Borrower and Lender, shall survive the execution, delivery and performance of this Agreement and the creation and payment of any indebtedness to Lender. This Agreement may be executed in any number of counterparts, each of which is to be deemed to be an original and all of which constitute one agreement.

10.     Notices. All notices, consents, requests, demands and other communications hereunder shall be given to or made upon the respective parties hereto at their respective addresses specified below or, as to any party, at such other address as may be designated by it in a written notice to the other party. All notices, requests, consents and demands hereunder shall be effective when personally delivered or five (5) days after depositing in the United States mail, certified or registered, postage prepaid, or when sent by confirmed facsimile, or when delivered by overnight courier.

If to Borrower:
Louis J. Pearlman
12488 Park Avenue
Windermere, Florida 34786
Telephone: (407) 876-0465
Fax: (____) ____-_____

If to Lender:

First National Bank & Trust Co. of Williston
22 East Fourth Street
Williston, ND 59801
Attn: _____
Telephone: (701) _____
Fax: (701)_____

11.     Jurisdiction. The Borrower hereby submits himself to the jurisdiction of the States of Minnesota and Florida and the federal courts of the United States located in such states in respect of all actions arising out of or in connection with the interpretation or enforcement of this Agreement and the documents related thereto.

12.     Duties of Lender With Respect to Collateral. Except with respect to the exercise of remedies under this Agreement, the Pledge Agreement, the Security Agreement, the Copyright Security Agreement or the other Loan Documents, Lender shall have no duty, responsibility or obligation of any nature whatsoever to service, collect, administer, enforce or account for the Collateral.

13.     Indemnification. Except for losses, claims, damages or liability arising out of the gross negligence or willful misconduct of Lender, Borrower agrees to indemnify and hold harmless Lender, and Lender's officers, agents (including outside legal counsel) and employees, against any and all losses, claims, damages or liability to which Lender, and Lender's officers, agents and employees, may become subject under any law in connection with the carrying out of the transactions contemplated by this Agreement or any other Loan Document, or the conduct of any activity related to the Collateral and to reimburse Lender, and Lender's officers, agents and employees, for any out-of-pocket legal and other expenses (including reasonable attorneys' fees, whether incurred at trial, on appeal, in bankruptcy proceedings, or otherwise) incurred by Lender, and Lender's officers, agents and employees, in connection with investigating any such losses, claims, damages or liabilities or in connection with defending any actions relating thereto. Lender agrees, at the request and expense of Borrower, to cooperate in the making of any investigation in defense of any such claim and promptly to assert any or all of the rights and privileges and defenses, which may be available to Lender. Borrower further releases and agrees to hold harmless Lender, and Lender's officers, agents and employees, from and against all losses, damages, penalties, liabilities, or expenses (including reasonable legal fees, whether incurred at trial, on appeal, in bankruptcy proceedings, or otherwise) due to or arising out of any misrepresentation of information furnished to Lender by Borrower or out of a breach of any covenant, representation or undertaking of Borrower contained in this Agreement or any other Loan Document. The provisions of this Section shall survive the payment of the Note and the Loan.

14.     Attorneys Fees and Taxes. Borrower shall reimburse Lender, upon demand, for all costs and expenses actually incurred, including without limitation attorney's fees paid or incurred by Lender in connection with:

a.     The preparation or review of the Loan Document the perfection, protection, enforcement or foreclosure of the security interests created by the Loan Documents, the protection or enforcement of the interests and collateral security of Lender, in any litigation or bankruptcy or insolvency proceeding or the prosecution or defense of any action or proceeding relating in any way to the transactions contemplated by this Agreement, travel to and from the offices and place of business of Borrower and/or any one or more of the Trans Continental Companies, the negotiation and preparation of the Loan Documents and all other documents necessary or desirable in connection with the original execution and delivery of Loan Documents;

b.     Subsequent to the initial Closing, Borrower shall pay all fees and expenses of Lender including attorney's fees in connection with the negotiation of any amendments or modifications to any of the Loan Documents requested by or consented to by Borrower or, if an Event of Default has occurred and is continuing, required by Lender, and any related documents, instruments or agreements and the preparation of any and all documents necessary or desirable to effect such amendments or modifications; and

c.     The enforcement by Lender during the term hereof or thereafter of the rights or remedies of Lender hereunder or under any of the foregoing documents, instruments or agreements, including without limitation reasonable costs and expenses of collection, whether or not suit is filed with respect thereto and whether such costs are paid or incurred, or to be paid or incurred, prior to or after entry of judgment.

d.     Borrower agrees to pay all stamp, document, transfer, recording or filing taxes or fees and similar impositions now or hereafter payable in connection with the Loan Documents, or any other documents, instruments or transactions pursuant to or in connection herewith or therewith, including without limitation all Florida documentary stamp taxes and intangible taxes payable in connection with such transactions, and Borrower agrees to save Lender and any Participant harmless from and against any and all present or future claims, liabilities or losses with respect to or resulting from any omission to pay or delay in paying any such taxes, fees or impositions, unless such omission or delay is due to gross negligence or willful misconduct on the part of Lender. All such expenses, taxes or attorney's fees shall be payable to Lender on demand. The obligations of Borrower under this Section shall survive the repayment of the Note and Loan.

15.     Placement Fee. The Borrower shall pay to North American Capital Markets ("NACM"), on or before Closing, a placement fee in accordance with that certain Placement Fee Agreement dated January 5, 2004, by and between NACM and the Borrower (the "Placement Fee").

16.     Relationship Between The Parties.

a.     Lender's Rights to Administer the Loan. Lender may at any time and from time to time, without the consent or notice to, Borrower, without incurring responsibility to Borrower, and without affecting, impairing or releasing any of the obligations of Borrower hereunder:

i. Sell, exchange, surrender, realize upon, release (with or without consideration) or otherwise deal with in any manner and in any order any property of any person or entity pledged to Lender or otherwise securing Borrower's liability, or otherwise providing recourse to Lender with respect thereto;

ii. Exercise or refrain from exercising any rights against Borrower, any one or more of the Trans Continental Companies or others with respect to Borrower's liability, or otherwise act or refrain from acting;

iii. Settle or compromise any of Borrower's liability, any security therefor or other recourse with respect thereto, or subordinate the payment or performance of all or any part thereof to the payment of any liability (whether due or not) of Borrower to any creditor of Borrower;

iv. Apply any sum received by Lender from any source in respect of any liabilities of Borrower to Lender to any of such liabilities, regardless of whether the Note remains unpaid;

v. Fail to set off and/or release, in whole or in part, any balance of any account or any credit on its books in favor of Borrower, or of any other person, and extend credit in any manner whatsoever to Borrower, and generally deal with Borrower and any security for Borrower's liability or any recourse with respect thereto as Lender may see fit; and/or

vi. Consent to or waive any breach of, or any act, omission or default under, this Agreement or any other Loan Document, including, without limitation, any agreement providing collateral security for the payment of Borrower's liability hereunder or any other indebtedness of Borrower.

b. <u>Primary Obligation</u>. No invalidity, irregularity or unenforceability of all or any part of Borrower's liability or of any security therefor or other recourse with respect thereto shall affect, impair or be a defense to the Borrower's liability, and all obligations under the Note and this Agreement.

c. <u>Payments Recovered From Lender</u>. If any payment received by Lender and applied to any obligations is subsequently set aside, recovered, rescinded or required to be returned for any reason (including, without limitation, the bankruptcy, insolvency or reorganization of Borrower or any other obligor), the obligations to which such payment was applied shall be deemed to have continued in existence, notwithstanding such application, and Borrower shall be liable for such obligations as fully as if such application had never been made. References in this Agreement to amounts "irrevocably paid" or to "irrevocable payment" refer to payments that cannot be set aside, recovered, rescinded or required to be returned for any reason.

d. <u>Actions Not Required</u>. Borrower hereby waives any and all right to cause a marshalling of the Borrower's assets or any other action by any court or other governmental body with respect thereto insofar as the rights of Lender hereunder are concerned or to cause Lender to proceed against any security for Borrower's liability or any other recourse which Lender may have with respect thereto, and further waives any and all requirements that Lender institute any action or proceeding at law or in equity against anyone else, or with respect to this

Agreement, the Loan Documents, or any collateral security for Borrower's liability, as a condition precedent to making demand on, or bringing an action or obtaining and/or enforcing a judgment against Borrower. Borrower further waives any requirement that Lender seek performance by any other person, of any obligation under this Agreement, the Loan Documents or any collateral security for Borrower's liability as a condition precedent to making a demand on, or bringing an action or obtaining and/or enforcing a judgment against Borrower. Borrower shall have no right of setoff against Lender or any Participant with respect to any of its obligations hereunder. Any remedy or right hereby granted which shall be found to be unenforceable as to any person or under any circumstance, for any reason, shall in no way limit or prevent the enforcement of such remedy or right as to any other person or circumstance, nor shall such unenforceability limit or prevent enforcement of any other remedy or right hereby granted.

e. No Subrogation. Notwithstanding any payment or payments made by Borrower hereunder or any setoff or application of funds of Borrower by Lender, Borrower shall not be entitled to be subrogated to any of the rights of Lender against any guarantor or any collateral security or guaranty or right of offset held by Lender for the payment of the obligations, nor shall Borrower seek or be entitled to seek any contribution or reimbursement from any guarantor in respect of payments made by Borrower hereunder, until all amounts owing to Lender by Borrower on account of the obligations are irrevocably paid in full. If any amount shall be paid to Borrower on account of such subrogation rights at any time when all of the obligations shall not have been irrevocably paid in full, such amount shall be held by Borrower, and shall, forthwith upon receipt by Borrower, be turned over to Lender in the exact form received by Borrower (duly endorsed by Borrower to Lender, if required), to be applied against the obligations, whether matured or unmatured, in such order as Lender may determine.

17. Amendments. No amendment, modification or waiver of any provision of the Loan Documents and no consent to any departure by Borrower therefrom shall in any event be effective unless the same shall be in writing and signed by Lender, and then such amendment, modification, waiver or consent shall be effective only in the specific instance and for the purpose for which given. Neither this Agreement nor any provision hereof may be changed, waived, discharged or terminated orally, but only by an instrument in writing signed by the party against whom enforcement of the change, waiver, discharge or termination is sought.

18. Marshalling; Payments Set Aside. Lender shall be under no obligation to marshal any assets in favor of Borrower or any other Person or against or in payment of the Loan and other indebtedness of Borrower to Lender. To the extent that Borrower makes a payment or payments to Lender or Lender exercises its rights of setoff, and such payment or payments or the proceeds of such setoff or any part thereof are subsequently invalidated, declared to be fraudulent or preferential, set aside and/or required to be repaid to a trustee, receiver or any other party under any bankruptcy law, state or federal law, common law or equitable cause, then to the extent of such recovery, the obligation or part thereof originally intended to be satisfied shall be revived and continued in full force and effect as if such payment had not been made or such enforcement or setoff had not occurred.

19. Invalid Provisions. If fulfillment of any provision hereof, or any transaction related thereto at the time performance of any such provision shall be due, shall involve

transcending the limit of validity prescribed by law, then, ipso facto, the obligation to be fulfilled shall be reduced to the limit of such validity; and such clause or provision shall be deemed invalid as though not herein contained, and the remainder of this Agreement shall remain operative in full force and effect.

20. _Not Joint Ventures._ Lender is not, and shall not by reason of any provision of any of the Loan Documents be deemed to be, a joint venturer with or partner or agent of Borrower.

21. _Notice of Change of Location._ Borrower shall promptly notify Lender of any change in location of Borrower's principal place of residence or the offices where any one or more of the Trans Continental Companies keeps its records concerning accounts and contract rights.

22. _Setoffs._ If the unpaid principal amount of the Loan, interest accrued thereon or any other amount owing by Borrower under the Loan Documents shall have become due and payable (by demand, acceleration or otherwise), Lender shall have the right, in addition to all other rights and remedies available to it, without notice to Borrower, to set off against, and to appropriate and apply to such due and payable amounts any debt owing to, and any other funds held in any manner by Lender for the account of, Borrower; provided, however, that Lender's right to set off, as against any funds which constitute proceeds of any portion of the Collateral, shall be limited in the same manner and to the same extent as Lender's rights and remedies generally as provided in the Pledge Agreement. Such right shall exist whether or not Lender shall have made any demand hereunder or under any other Loan Document, whether or not such debt owing to or funds held for the account of Borrower is or are matured or unmatured, and regardless of the existence or adequacy of any collateral, guaranty or any other security, right or remedy available to Lender.

23. _Remedies Cumulative._ The rights and remedies herein specified of the parties hereto are cumulative and not exclusive of any rights or remedies, which the parties hereto would otherwise have at law or in equity or by statute.

24. _Integration; Conflicting Terms._ This Agreement together with the other Loan Documents comprises the entire agreement of the parties on the subject matter hereof, supersedes, and replaces all prior agreements, oral and written, on such subject matter. If any term of any of the other Loan Documents expressly conflicts with the provisions of this Agreement, the provisions of this Agreement shall control; provided, however, that the inclusion of supplemental rights and remedies of Lender in any of the other Loan Documents shall not be deemed a conflict with this Agreement.

25. _Governing Law; Construction._ The Loan Documents shall be governed by, and construed in accordance with Minnesota law. Whenever possible, each provision of the Loan Documents and any other statement, instrument or transaction contemplated hereby or thereby or relating hereto or thereto shall be interpreted in such manner as to be effective and valid under such applicable law, but, if any provision of the Loan Documents or any other statement, instrument or transaction contemplated hereby or thereby or relating hereto or thereto shall be held to be prohibited or invalid under such applicable law, such provision shall be ineffective only to the extent of such prohibition or invalidity, without invalidating the remainder of such

provision or the remaining provisions of the Loan Documents or any other statement, instrument or transaction contemplated hereby or thereby or relating hereto or thereto.

26. <u>Waiver of Jury Trial</u>. Borrower hereby irrevocably waives any and all right to trial by jury in any legal proceeding arising out of or relating to this Agreement, the Note or any of the documents executed in connection therewith or the transactions contemplated hereby or thereby.

IN WITNESS WHEREOF, this Agreement has been duly executed and delivered by the proper officers thereunto duly authorized on the day and year first above written.

BORROWER:

_____
Louis J. Pearlman

LENDER:

FIRST NATIONAL BANK & TRUST
CO. OF WILLISTON

By: _____
Its: _____

2361105v2

- 17 -

provision or the remaining provisions of the Loan Documents or any other statement, instrument or transaction contemplated hereby or thereby or relating hereto or thereto.

26.    Waiver of Jury Trial. Borrower hereby irrevocably waives any and all right to trial by jury in any legal proceeding arising out of or relating to this Agreement, the Note or any of the documents executed in connection therewith or the transactions contemplated hereby or thereby.

IN WITNESS WHEREOF, this Agreement has been duly executed and delivered by the proper officers thereunto duly authorized on the day and year first above written.

BORROWER:

_____
Louis J. Pearlman

LENDER:

FIRST NATIONAL BANK & TRUST
CO. OF WILLISTON

By: _Rick Nichols_____
Its: _Sr. Vice President_____

2361105v2

- 17 -

# PROMISSORY NOTE

$18,500,000.00

Minneapolis, Minnesota
June 29, 2005

1.    FOR VALUE RECEIVED, **LOUIS J. PEARLMAN**, a Florida resident (the "Borrower"), hereby promises to pay to the order of FIRST NATIONAL BANK & TRUST CO. OF WILLISTION, a national banking association, its successors and assigns (the "Lender"), at its banking house located in Williston, North Dakota, the principal sum of Eighteen Million Five Hundred Thousand and 00/100 DOLLARS ($18,500,000.00), in lawful money of the United States and immediately available funds, together with interest on the unpaid balance accruing as of the date hereof at a rate equal at all times to the greater of (a) eight and one-half percent (8.50%) or (b) two and one-half percent (2.50%) per annum in excess of the "Prime Rate" (as hereinafter defined) as the same changes from time to time and is adjusted in the manner hereinafter set forth.

2.    Accrued interest on this Note shall be due and payable on the 1st day of each calendar month, commencing on August 1, 2005 and continuing thereafter through June 1, 2009 (the "Maturity Date"). The outstanding principal balance hereof shall be due and payable in seven (7) bi-annual installments equal to $2,312,500.00 each, commencing on December 1, 2005 and continuing on the first (1st) day of each June and December thereafter, through and including December 1, 2008, and in one final installment equal to the entire then-outstanding principal balance of this Note, together with all accrued and unpaid interest thereon, on the Maturity Date.

3.    The term "Prime Rate" shall mean the prime rate of interest (or equivalent successor rate) as published in the money rates section of the Midwest Edition of *The Wall Street Journal*. Said rate of interest due shall be adjusted effective as of the first (1st) day of each calendar month, to the extent of any change in the Prime Rate (each such day hereinafter being referred to as an "Adjustment Date"). All such adjustments to said rate shall be made and become effective as of the Adjustment Date and said rate as adjusted shall remain in effect until and including the day immediately preceding the next Adjustment Date. Interest hereunder shall be computed on the basis of a year of three hundred sixty (360) days but charged for actual days principal is unpaid.

4.    The outstanding principal balance of this Note may be prepaid at any time at the option of the Borrower without premium or penalty. Any payment(s) on this Note using the proceeds of any condemnation or insurance award or from a refinancing or from the sale of any collateral securing this Note (whether such sale is made with or without the consent of the Lender), and any payment(s) made after any event of default has occurred under this Note, and any other payment(s) on this Note from any other source in excess of the principal payments scheduled pursuant to Paragraph 2 above, shall be deemed a prepayment for purposes of this Paragraph 4 and Paragraph 6 below.

5.    If any installment of principal or interest on this Note, including the payment required on the Maturity Date, is not paid within fifteen (15) days of the due date thereof, the Borrower shall pay to the Lender a late charge equal to five percent (5.0%) of the amount of such installment.

6. All payments and prepayments shall, at the option of the Lender, be applied first to any costs of collection, second to any late charges, third to accrued interest on this Note, and lastly to principal (and, in the case of any prepayments, to installments of principal in the inverse order of their maturity).

7. Notwithstanding anything to the contrary contained herein, if the rate of interest, late payment fee, prepayment penalties or any other charges or fees due hereunder are determined by a court of competent jurisdiction to be usurious, then said interest rate, fees and/or charges shall be reduced to the maximum amount permissible under applicable Minnesota law.

8. Upon the occurrence of an Event of Default or at any time thereafter, at the option of the Lender, the outstanding principal balance hereof shall bear interest at a rate equal to two percent (2.0%) per annum in excess of the rate of interest otherwise applicable pursuant to Section 1 hereof (the "Default Rate"), in order to compensate the Lender for administrative expenses and increased risk to the Lender associated with the occurrence of an Event of Default.

9. Upon the occurrence of an Event of Default or at any time thereafter, the outstanding principal balance hereof and accrued interest and all other amounts due hereon shall, at the option of the Lender, become immediately due and payable, without notice or demand.

10. Upon the occurrence of an Event of Default or anytime thereafter, the Lender shall have the right to set off any and all amounts due hereunder by the Borrower to the Lender against any indebtedness or obligation of the Lender to the Borrower.

11. Upon the occurrence at any time of an Event of Default or at any time thereafter, the Borrower promises to pay all costs of collection of this Note, including but not limited to attorneys' fees, paid or incurred by the Lender on account of such collection, whether or not suit is filed with respect thereto and whether such cost or expense is paid or incurred, or to be paid or incurred, prior to or after the entry of judgment.

12. This Note is secured by that certain Securities Pledge Agreement of even date herewith executed by the Borrower in favor of the Lender (the "Pledge Agreement"), by that certain Third Party Security Agreement of even date herewith executed by Trans Continental Merchandising, Inc. in favor of the Lender (the "Merchandising Security Agreement"), by that certain Third Party Security Agreement of even date herewith executed by ROCKS TIMEPIECES, INC. in favor of the Lender (the "Timepieces Security Agreement") and by that certain Third Party Copyright Security Agreement of even date herewith executed by Trans Continental Publishing, Inc. in favor of the Lender (the "Copyright Security Agreement"), and the payment hereof has been guaranteed by Trans Continental Records, Inc., Trans Continental Airlines, Inc., ROCKS TIMEPIECES, INC., and ROCKS FINE JEWELRY, INC. (collectively, the "Guarantors"), and is entitled to all of the benefits provided for in each of said agreements.

13. As used herein, the term "Event of Default" shall mean any default or event of default as defined or described in that certain Loan Agreement dated of even date herewith, by and between the Borrower and the Lender, as amended from time to time (the "Loan Agreement").

14. Demand, presentment, protest and notice of nonpayment and dishonor of this Note are hereby waived.

15. This Note shall be governed by and construed in accordance with the laws of the State of Minnesota.

16. Borrower hereby irrevocably submits to the jurisdiction of any Minnesota or Florida state court or federal court over any action or proceeding arising out of or relating to this Note, the Pledge Agreement, the Merchandising Security Agreement, the Timepieces Security Agreement, the Copyright Security Agreement, the Loan Agreement and any instrument, agreement or document related thereto, and Borrower hereby irrevocably agrees that all claims in respect of such action or proceeding may be heard and determined in such Minnesota or Florida state or federal court. Borrower hereby irrevocably waives, to the fullest extent it may effectively do so, the defense of an inconvenient forum to the maintenance of such action or proceeding. Borrower irrevocably consents to the service of copies of the summons and complaint and any other process which may be served in any such action or proceeding by the mailing by United States certified mail, return receipt requested, of copies of such process to Borrower's last known address. Borrower agrees that judgment final by appeal, or expiration of time to appeal without an appeal being taken, in any such action or proceeding shall be conclusive and may be enforced in any other jurisdictions by suit on the judgment or in any other manner provided by law. Nothing in this Paragraph shall affect the right of Lender to serve legal process in any other manner permitted by law or affect the right of Lender to bring any action or proceeding against Borrower or its property in the courts of any other jurisdiction to the extent permitted by law.

Louis J. Pearlman

2361114v2

# SECURITIES PLEDGE AGREEMENT

**THIS PLEDGE AGREEMENT** (this "Agreement"), dated as of June, 2005, made by Louis J. Pearlman, a Florida resident, (the "**Pledgor**"), is in favor of FIRST NATIONAL BANK & TRUST CO. OF WILLISTON, a national banking association (the "**Pledgee**").

## WITNESSETH

**WHEREAS**, the Pledgor and the Pledgee are parties to that certain Loan Agreement, dated of even date herewith as amended, amended and restated or otherwise modified from time to time (the "**Loan Agreement**"), pursuant to which the Pledgee has agreed to extend loans and certain other financial accommodations to the Pledgor and the Pledgor has agreed to grant to the Pledgee a security interest in certain of the Pledgor's assets;

**WHEREAS**, the Pledgor presently owns all of the issued and outstanding shares of common stock as more fully described in Schedule I attached hereto and made a part hereof and issued by the corporations named therein (each of such corporations being referred to in said Schedule I as an "**Issuer**") and may in the future acquire additional shares of said capital stock (all of such now owned or hereafter acquired shares of preferred capital stock being collectively referred to herein as the "**Pledged Shares**");

**NOW, THEREFORE**, for good and valuable consideration, the receipt, sufficiency and adequacy of which are hereby acknowledged, the Pledgor hereby agrees as follows:

1.  **Pledge**. The Pledgor hereby pledges to the Pledgee, and grants to the Pledgee a security interest in, the following (the "**Pledged Collateral**"):

    (a)   the Pledged Shares now owned by the Pledgor and the certificates, if any, representing such Pledged Shares, and all dividends, cash, securities, instruments, rights and other property from time to time received, receivable or otherwise distributed in respect of or in exchange for any or all of such Pledged Shares; and

    (b)   all other property hereafter delivered to the Pledgee in substitution for, as proceeds of, or in addition to any of the foregoing, all certificates, instruments and documents representing or evidencing such property, and all cash, securities, interest, dividends, rights and other property at any time and from time to time received, receivable or otherwise distributed in respect of or in exchange for any or all thereof.

2.  **Security for Obligations**. The Pledged Collateral secures the payment of all of the Pledgor's "Obligations", as such term is defined in the Loan Agreement, to the

Pledgee, whether for principal, interest, fees, expenses or otherwise, and all obligations of the Pledgor now or hereafter existing under this Agreement (the Obligations under the Loan Agreement and all such obligations of the Pledgor now or hereafter existing under this Agreement being referred to herein as the "**Obligations**").

3.    **Delivery of Pledged Shares.** All certificates, instruments or documents, if any, representing or evidencing the Pledged Shares shall be delivered to and held by or on behalf of the Pledgee pursuant hereto and shall be in suitable form for transfer by delivery, shall be accompanied by duly executed instruments of transfer or assignment in blank, all in form and substance satisfactory to the Pledgee. In the event any or all of the Pledged Shares are evidenced by a book entry, Pledgor shall execute and deliver or cause to be executed and delivered to Pledgee such control agreements, documents, and agreements as are required by Pledgee to create and perfect a security interest in such uncertificated Pledged Shares. In addition, the Pledgee shall have the right at any time to exchange certificates or instruments representing or evidencing Pledged Shares for certificates or instruments of smaller or larger denominations.

4.    **Representations and Warranties.** The Pledgor represents and warrants as follows:

    (a)    The Pledged Shares have been duly authorized and validly issued and are fully paid and non-assessable.

    (b)    The Pledgor is, or at the time of any future delivery, pledge, assignment or transfer will be, the legal and beneficial owner of the Pledged Collateral, free and clear of any lien, security interest, pledge, warrant, option, purchase agreement, shareholders' agreement, restriction, redemption agreement or other charge, encumbrance or restriction of any nature on the Pledged Collateral, except for the lien created by this Agreement, with full right to deliver, pledge, assign and transfer the Pledged Collateral to the Pledgee as Pledged Collateral hereunder.

    (c)    The pledge of the Pledged Collateral pursuant to this Agreement creates a valid, perfected and only security interest in the Pledged Collateral, securing the payment of the Obligations.

    (d)    No authorization, approval, or other action by, and no notice to or filing with, any governmental authority or regulatory body is required either (i) for the pledge by the Pledgor of the Pledged Collateral pursuant to this Agreement or for the execution, delivery or performance of this Agreement by the Pledgor, or (ii) for the exercise by the Pledgee of the voting or other rights provided for in this Agreement or the remedies in respect of the Pledged Collateral pursuant to this Agreement (except as may be required in connection with a disposition of such shares by laws affecting the offering and sale of securities generally).

(e) The Pledgor has full power and authority to enter into this Agreement and has the right to vote, pledge and grant a security interest in the Pledged Collateral as provided by this Agreement.

(f) None of the Pledged Shares has been issued in violation of any federal, state or other law, regulation or rule pertaining to the issuance of securities, or in violation of any rights, pre-emptive or otherwise, of any present or past stockholder of any Issuer described in Schedule I attached hereto and made a part hereof.

5. **Further Assistance**. The Pledgor agrees that at any time and from time to time, at the expense of the Pledgor, the Pledgor will promptly execute and deliver, or cause to be executed and delivered, all certificates, if any, representing the Pledged Shares, stock and/or bond powers, proxies, assignments, instruments and documents; will take all steps necessary to properly register the transfer of the security interest hereunder on the books of the Issuer of any uncertificated securities included in the Pledged Shares; and will take all further action that may be necessary or desirable, or that the Pledgee may request in its sole discretion, in order to perfect and protect any security interest granted or purported to be granted hereby or to enable the Pledgee to exercise and enforce its rights and remedies hereunder with respect to any Pledged Collateral and to carry out the provisions and purposes hereof.

6. **Voting Rights; Dividends; Etc.**

(a) So long as no Event of Default (as defined) or event which, with the giving of notice or the lapse of time, or both, would become an Event of Default, shall have occurred:

(i) The Pledgor shall be entitled to exercise any and all voting and other consensual rights pertaining to the Pledged Shares or any part thereof for any purpose not inconsistent with the terms of this Agreement or the Loan Agreement; provided, however, that the Pledgor shall not exercise nor shall it refrain from exercising any such right if such action could have a material adverse effect on the value of the Pledged Collateral or any part thereof.

(ii) The Pledgor shall be entitled to receive and retain any and all dividends and interest paid in respect of the Pledged Collateral, provided however, that any and all

(A) dividends and interest paid or payable other than in cash in respect of, and instruments and other property received, receivable or otherwise distributed in respect of, or in exchange for, any Pledged Collateral,

(B) dividends and other distributions paid or payable in cash in respect of any Pledged Collateral in connection with a partial

or total liquidation or dissolution or in connection with a reduction of capital, capital surplus or paid-in-surplus, and

(C)     cash paid, payable or otherwise distributed in respect of principal of, or in redemption of, or in exchange for, any Pledged Collateral, shall be Pledged Collateral, shall be forthwith delivered to the Pledgee to hold as Pledged Collateral and shall, if received by the Pledgor, be received in trust for the benefit of the Pledgee, be segregated from the other property or funds of the Pledgor, and be forthwith delivered to the Pledgee as Pledged Collateral in the same form as so received (with any necessary endorsement).

(iii)     The Pledgor shall execute and deliver (or cause to be executed and delivered) to the Pledgee all such proxies and other instruments as the Pledgee may (reasonably) request for the purpose of enabling the Pledgee to exercise the voting and other rights which it is entitled to exercise pursuant to paragraph (i) above and to receive the dividends or interest payments which it is authorized to receive pursuant to paragraph (ii) above.

(b)     Upon the occurrence of an Event of Default or an event which, with the giving of notice or the lapse of time, or both, would become an Event of Default:

(i)     All rights of the Pledgor to exercise the voting and other consensual rights which it would otherwise be entitled to exercise pursuant to Section 6(a)(i) and to receive the dividends and interest payments which it would otherwise be authorized to receive and retain pursuant to Section 6(a)(ii) shall cease, and all such rights shall thereupon become vested in the Pledgee which shall thereupon have the sole right to exercise such voting and other consensual rights and to receive and hold as Pledged Collateral such dividends and interest payments; and

(ii)     All dividends and interest payments which are received by the Pledgor contrary to the provisions of paragraph (i) of this Section 6(b) shall be received in trust for the benefit of the Pledgee, shall be segregated from other funds of the Pledgor and shall be forthwith paid over to the Pledgee as Pledged Collateral in the same form as so received (with any necessary endorsements).

7.     **Transfers and Other Liens; Additional Shares.**     The Pledgor agrees that it will not (i) sell, assign, transfer, convey, exchange, pledge or otherwise dispose of, or grant any option, warrant, right, contract or commitment with respect to, any of the Pledged Collateral without the prior written consent of the Pledgee, or (ii) create or permit to exist any lien, security interest, pledge, proxy, purchase arrangement, restriction, redemption agreements, shareholders' agreement or other charge or encumbrance upon or with respect to any of the Pledged Collateral, except for the lien created by this Agreement.

8. **Application of Proceeds of Sale or Cash Held as Collateral.** The proceeds of sale of Pledged Collateral sold pursuant to this Agreement and/or the cash held as Pledged Collateral hereunder shall be (a) retained by the Pledgee as cash collateral for the Obligations, or (b) at the election of the Pledgee, applied by the Pledgee as follows:

>   **First:** to payment of the costs and expenses of such sale, including the out-of-pocket expenses of the Pledgee and the reasonable fees and out-of-pocket expenses of counsel employed in connection therewith, and to the payment of all advances made by the Pledgee for the account of the Pledgor hereunder, and the payment of all costs and expenses incurred by the Pledgee in connection with the administration and enforcement of this Agreement, to the extent that such advances, costs and expenses shall not have been reimbursed to the Pledgee;

>   **Second:** to the payment of interest accrued and unpaid, if any, on any of the Obligations to and including the date of such application and then to the payment or prepayment of principal of any of the Obligations and then to the payment of the balance of the Obligations in such order as Pledgee may determine in its sole discretion; and

>   **Third:** the balance, if any, of such proceeds shall be paid to the Pledgor, or its successors or assigns, or as a court of competent jurisdiction may direct.

9. **The Pledgee Appointed Attorney-in-Fact.** The Pledgor hereby appoints the Pledgee as the Pledgor's attorney-in-fact, with full authority in the place and stead of the Pledgor and in the name of the Pledgor or otherwise, from time to time in the Pledgee's discretion to take any action and to execute any instrument which the Pledgee may deem necessary or advisable to accomplish the purposes of this Agreement, including, without limitation, to receive, endorse and collect all instruments made payable to the Pledgor representing any dividend, interest payment or other distribution in respect of the Pledged Collateral or any part thereof and to give full discharge for the same.

10. **The Pledgee May Perform.** If the Pledgor fails to perform any agreement contained herein, the Pledgee may itself perform, or cause performance of, such agreement, and the expenses of the Pledgee incurred in connection therewith shall be payable by the Pledgor under Section 16.

11. **Reasonable Care.** The Pledgee shall be deemed to have exercised reasonable care in the custody and preservation of the Pledged Collateral in its possession if the Pledged Collateral is accorded treatment substantially equal to that which the Pledgee accords its own property, it being understood that the Pledgee shall not have any responsibility for (i) ascertaining or taking action with respect to calls, conversions, exchanges, maturities, tenders or other matters relative to any Pledged Collateral, whether or not the Pledgee has or is deemed to have knowledge of such matters, or (ii) taking any necessary steps to preserve rights against any parties with

respect to any Pledged Collateral; provided, however, that upon the Pledgor's instruction, the Pledgee shall use reasonable efforts to take such action as the Pledgor directs the Pledgee to take with respect to calls, conversions, exchanges, maturities, tenders, rights against other parties or other similar matters relative to the Pledged Collateral, but failure of the Pledgee to comply with any such request shall not of itself be deemed a failure to exercise reasonable care, and no failure of the Pledgee to preserve or protect any rights with respect to the Pledged Collateral against prior parties, or to do any act with respect to preservation of the Pledged Collateral not so requested by the Pledgor, shall be deemed a failure to exercise reasonable care in the custody or preservation of the Pledged Collateral.

**12.** **Subsequent Changes Affecting Collateral.** The Pledgor represents to the Pledgee that the Pledgor has made its own arrangements for keeping informed of changes or potential changes affecting the Pledged Collateral (including, but not limited to, rights to convert, rights to subscribe, payment of dividends, reorganization or other exchanges, tender offers and voting rights), and the Pledgor agrees that the Pledgee shall have no responsibility or liability for informing the Pledgor of any such changes or. potential changes or for taking any action or omitting to take any action with respect thereto.

**13.** **Remedies upon an Event of Default.** If any Event of Default shall have occurred, the Pledgee shall have, in addition to all other rights given by law or by this Agreement, the Loan Agreement or otherwise, all of the rights and remedies with respect to the Pledged Collateral of a secured party under the Uniform Commercial Code ("Code") in effect in the State of Minnesota at that time and the Pledgee may, without notice and at its option, transfer or register the Pledged Collateral or any part thereof on the books of the Issuer thereof into the name of the Pledgee or the Pledgee's nominee(s), with or without any indication that such Pledged Collateral is subject to the security interest hereunder. In addition, with respect to any Pledged Collateral which shall then be in or shall thereafter come into the possession or custody of the Pledgee, the Pledgee may sell or cause the same to be sold at any broker's board or at public or private sale, in one or more sales or lots, at such price or prices as the Pledgee may deem best, for cash or on credit or for future delivery, without assumption of any credit risk. The purchaser of any or all Pledged Collateral so sold shall thereafter hold the same absolutely, free from any claim, encumbrance or right of any kind whatsoever, except for claims, encumbrances or rights that may arise without the knowledge or consent of the Pledgor. Unless any of the Pledged Collateral threatens to decline speedily in value or is or becomes of a type sold on a recognized market, the Pledgee will give the Pledgor reasonable notice of the time and place of any public sale thereof, or of the time after which any private sale or other intended disposition is to be made. Any sale of the Pledged Collateral conducted in conformity with reasonable commercial practices of banks, insurance companies, commercial finance companies, or other financial institutions disposing of property similar to the Pledged Collateral shall be deemed to be commercially reasonable. Any requirements of notice shall deemed to be a reasonable authenticated notice of disposition if it is mailed to the Pledgor as provided in Section 20 below, at least five (5) days before the time of the sale or disposition and such notice

shall (i) describe Pledgor and Pledgee, (ii) describe the Pledged Collateral that is the subject of the intended disposition, (iii) state the method of intended disposition, (iv) state that the Pledgor is entitled to an accounting of the Obligations and state the charge, if any, for an accounting and (v) state the time and place of any public disposition or the time after which any private sale is to be made. Any other requirement of notice, demand or advertisement for sale is, to the extent permitted by law, waived. Pledgee may disclaim any warranties that might arise in connection with the sale or other disposition of the Pledged Collateral and Pledgee has no obligation to provide any warranties at such time. The Pledgee may, in its own name or in the name of a designee or nominee, buy any of the Pledged Collateral at any public sale and, if permitted by applicable law, at any private sale. All expenses (including court costs and reasonable attorneys' fees and expenses) of, or incident to, the enforcement of any of the provisions hereof shall be recoverable from the proceeds of the sale or other disposition of Pledged Collateral. In view of the fact that federal and state securities laws may impose certain restrictions on the method by which a sale of the Pledged Collateral may be effected after an Event of Default, the Pledgor agrees that upon the occurrence or existence of any Event of Default, the Pledgee may, from time to time, attempt to sell all or any part of the Pledged Collateral by means of a private placement, restricting the prospective purchasers to those who can make the representations and agreements required of purchasers of securities in private placements. In so doing, the Pledgee may solicit offers to buy the Pledged Collateral, or any part of it, for cash, from a limited number of investors deemed by the Pledgee in its judgment, to be responsible parties who might be interested in purchasing the Pledged Collateral, and if the Pledgee solicits such offers from not less than three (3) such investors, then the acceptance by the Pledgee of the highest offer obtained therefrom shall be deemed to be a commercially reasonable method of disposition of the Pledged Collateral.

In addition, upon the occurrence of an Event of Default, all rights of the Pledgor to exercise the voting and other rights which it would otherwise be entitled to exercise and to receive cash dividends and interest payments, shall cease, and all such rights shall thereupon become vested in the Pledgee as provided in Section 6.

14.  **Authority of The Pledgee.** The Pledgee shall have and be entitled to exercise all such powers hereunder as are specifically delegated to the Pledgee by the terms hereof, together with such powers as are incidental thereto. The Pledgee may execute any of its duties hereunder by or through agents or employees. Neither the Pledgee, nor any director, manager, officer, agent or employee of the Pledgee, shall be liable for any action taken or omitted to be taken by it or them hereunder or in connection herewith, except for its or their own gross negligence or willful misconduct. The Pledgor hereby agrees to indemnify and hold harmless the Pledgee and/or any such director, manager, officer, agent or employee from and against any and all liability incurred by any of them, hereunder or in connection herewith, unless such liability shall be due to its or their own gross negligence or willful misconduct.

15.  **Termination.** This Agreement shall terminate when all the Obligations have been fully paid and performed, at which time the Pledgee shall reassign and redeliver (or cause to be reassigned and redelivered) to the Pledgor, or to

such person or persons as the Pledgor shall designate, against receipt, such of the Pledged Collateral (if any) as shall not have been sold or otherwise applied by the Pledgee pursuant to the terms hereof and shall still be held by it hereunder, together with appropriate instruments of reassignment and release. Any such reassignment shall be without recourse upon or warranty by the Pledgee and at the expense of the Pledgor.

16.   **Expenses.**   The Pledgor agrees to reimburse the Pledgee, on demand for any and all reasonable expenses, including the reasonable fees and expenses of its counsel and of any experts and agents, which the Pledgee may incur in connection with (i) the administration of this Agreement, (ii) the custody or preservation of, or the registration of the Pledged Collateral, (iii) the exercise or enforcement of any of the rights of the Pledgee hereunder, or (iv) the failure by the Pledgor to perform or observe any of the provisions hereof.

17.   **Security Interest Absolute.**   All rights of the Pledgee and security interests hereunder, and all obligations of the Pledgor hereunder, shall be absolute and unconditional irrespective of:

(i)      any lack of validity or enforceability of the Loan Agreement or any other agreement or instrument relating thereto;

(ii)      any change in the time, manner or place of payment of, or in any other term of, all or any of the Obligations, or any other amendment or waiver of or any consent to any departure from the Loan Agreement;

(iii)      any exchange, surrender, release or non-perfection of any other collateral, or any release or amendment or waiver of or consent to departure from any guaranty, for all or any of the Obligations; or

(iv)      any other circumstance which might otherwise constitute a defense available to, or a discharge of, the Pledgor in respect of the Obligations or of this Agreement.

18.   **Amendments, Waivers and Consents.**   No amendment or waiver of any provision of this Agreement nor consent to any departure by the Pledgor herefrom, shall in any event be effective unless the same shall be in writing and signed by the Pledgee, and then such amendment, waiver or consent shall be effective only in the specific instance and for the specific purpose for which given.

19.   **Notices.**   Any notice required or desired to be served, given or delivered hereunder shall be in writing (including facsimile transmission), and shall be deemed to have been validly served, given or delivered upon the earlier of (a) personal delivery to the address set forth below (b) in the case of mailed notice, three (3) days after deposit in the United States mails, with proper postage for certified mail, return receipt requested, prepaid, or in the case of notice by Federal Express or other reputable overnight courier service, one (1) Business Day after delivery to such courier service,

and (c) in the case of facsimile transmission, upon transmission with confirmation of receipt, addressed to the party to be notified as follows:

If to the Pledgor:            Louis J. Pearlman
                              12488 Park Avenue
                              Windermere, FL 34786
                              Facsimile Number: (4σ7) 87ε-0468

If to the Pledgee:            First National Bank & Trust
                              Company of Williston
                              22 East Fourth Street
                              Williston, ND 59801
                              Attention: _____
                              Facsimile Number: (701) _____

or to such other address as any of the parties may hereafter designate for itself by written notice to the other parties in the manner herein prescribed.

**20.** **Continuing Security Interest.** This Agreement shall create a continuing security interest in the Pledged Collateral and shall (i) remain in full force and effect until payment in full of the Obligations; (ii) be binding upon the Pledgor, its successors and assigns; and (iii) inure to the benefit of the Pledgee and its successors, transferees and assigns.

**21.** **Waivers.** The Pledgor waives presentment and demand for payment of any of the Obligations, protest and notice of dishonor or default with respect to any of the Obligations, and all other notices to which the Pledgor might otherwise be entitled, except as otherwise expressly provided herein or in the Loan Agreement.

**22.** **Governing Law; Terms.** This Agreement shall be governed by and construed in accordance with the internal laws (as opposed to conflict of laws provisions) and decisions of the State of Minnesota. Unless otherwise defined herein, terms defined in Articles 8 and 9 of the Minnesota Uniform Commercial Code are used herein as therein defined. Whenever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but, if any provision of this Agreement shall be interpreted in such manner as to be ineffective or invalid under applicable law, such provisions shall be ineffective or invalid only to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Agreement.

**23.** **Definitions.** The singular shall include the plural and vice versa and any gender shall include any other gender as the text shall indicate.

**24.** **Section Headings.** The section headings herein are for convenience of reference only, and shall not affect in any way the interpretation of any of the provisions hereof.

**IN WITNESS WHEREOF,** the Pledgor and the Pledgee have each caused this Agreement to be duly executed and delivered by its officer, if any, thereunto duly authorized as of the date first above written.

[Pledgor]

_____
Louis J. Pearlman

[Pledgee]

FIRST NATIONAL BANK & TRUST
CO. OF WILLISTON


By_____

Its_____

IN WITNESS WHEREOF, the Pledgor and the Pledgee have each caused this Agreement to be duly executed and delivered by its officer, if any, thereunto duly authorized as of the date first above written.

[Pledgor]

_____

Louis J. Pearlman

[Pledgee]

FIRST NATIONAL BANK & TRUST
CO. OF WILLISTON

By _Rick Nichols_____

Its _Sr. Vice President_____

10

# SCHEDULE I

Description of Pledged Shares

| ISSUER | NUMBER OF SHARES |
|--------|------------------|
| Trans Continental Airlines, Inc. | 269,700 shares of common stock (Cert. Nos. 1601 and 1614) |

2361122v2

11

## ASSIGNMENT SEPARATE FROM CERTIFICATE

**FOR VALUE RECEIVED,** _____ hereby sells, assigns and transfers unto two hundred sixty-nine thousand seven hundred (269,700) shares of the common stock of Trans Continental Airlines, Inc., a Florida corporation, standing in his name on the books of such corporation, represented by Certificate Nos. 1601 and 1614 herewith and does hereby irrevocably constitute and appoint _____ attorney to transfer the said stock on the books of the within named company with full power of substitution in the premises.

Dated: _____, ____

_____
Louis J. Pearlman

**IN THE PRESENCE OF**

_____

_____

2366639v1

Amount:         $2,455,377.16        Sequence Number:  6640897397
Account:        5489207526           Capture Date:     06/06/2006
Bank Number:    06300004             Check Number:     3250





6640897397

**EXHIBIT "D"**